# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------- X
                                          :

PECONIC BAYKEEPER, INC. and         :   Case No. _____
SOUNDKEEPER, INC.,               :

                           :   **COMPLAINT FOR**
           Plaintiffs,        :   **DECLARATORY AND**
                           :   **INJUNCTIVE RELIEF AND**
     v.                    :   **CIVIL PENALTIES**
                           :

NEW YORK STATE OFFICE OF PARKS,      :
RECREATION, AND HISTORIC            :
PRESERVATION,                 :
                           :
           Defendant.        :
                           :

----------------------------------------------------------- X

Plaintiffs Peconic Baykeeper, Inc. and Soundkeeper, Inc., by and through their counsel, hereby allege:

## I.

## INTRODUCTION

1.      Long Island's Suffolk County is confronting a severe nitrogen pollution problem at a scale seen in few other parts of this country.  The New York State Department of Environmental Conservation ("DEC") and the U.S. Environmental Protection Agency ("EPA") have formally recognized that virtually all of Suffolk County's coastal waters and tributaries are not meeting state water quality standards and are not supporting important uses such as swimming, fishing, boating, and shellfish consumption because of nitrogen pollution.

2.      The primary source of nitrogen in Suffolk County is wastewater from septic systems.  Nitrogen released from septic systems contaminates groundwater, which is the only source of drinking water for County residents.  Further, a great deal of nitrogen is conveyed

1

swiftly through groundwater into the surface waters of Suffolk County, including the Great South Bay, Peconic Bay, Long Island Sound, and their tributaries.  Excess nitrogen in coastal waters triggers algal blooms that reduce oxygen levels and water clarity, release foul odors, damage aquatic vegetation, kill fish, and produce toxic "red tides" and "brown tides" that endanger human health and make shellfish inedible.

3.     Large septic systems – both septic tanks and cesspools – are significant contributors to the nitrogen problem.  Suffolk County has an extraordinary number of such large septic systems: out of approximately 4,500 such systems statewide, more than 2,000 are in Suffolk County.

4.     Defendant New York State Office of Parks, Recreation, and Historical Preservation operates five of the largest septic systems in Suffolk County, all at waterfront parks: Hecksher, Robert Moses, Belmont Lake, Sunken Meadow and Wildwood state parks.  Together, the cesspools and septic tanks at these parks have the capacity to discharge more than 246,000 gallons of septic waste daily into Long Island's ground and surface waters.

5.     The Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387 (the "Clean Water Act" or "CWA"), prohibits all discharge of pollutants into waters of the United States without a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Clean Water Act.

6.     The Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j-26 (the "SDWA"), and its implementing regulations categorically prohibit the operation of large cesspools – which are little more than pits in the ground for the disposal of human waste.  The SDWA also prohibits operation of other types of large septic systems in a manner that endangers underground sources of drinking water, and requires the operators of such septic systems to obtain an underground

injection control permit (a "UIC" permit).

7.      The Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992k ("RCRA") prohibits the handling, transportation, and disposal of any solid waste in a manner that may present an imminent and substantial endangerment to health or the environment.

8.      At the five parks noted above, Defendant operates illegal large cesspools in violation of the SDWA; operates large capacity septic systems without a UIC permit and in a manner that endangers underground sources of drinking water, also in violation of the SDWA; discharges pollutants to rivers and estuaries via groundwater without a NPDES permit issued pursuant to Section 402 of the Clean Water Act, in violation of Section 301 of the CWA; and violates RCRA by disposing of solid wastes in a manner that causes an imminent and substantial endangerment to health and the environment because it contaminates drinking water sources, contributes to shellfish poisonings and harmful algal blooms, and otherwise causes significant environmental damage to Suffolk County's coastal ecosystems.

9.      This is a civil suit brought under the citizen suit enforcement provisions of the CWA, the SDWA, and RCRA to address and abate Defendant's ongoing and continuous violations of these laws.  Defendant must significantly improve its waste treatment systems and dramatically reduce its discharges of nitrogen, consistent with the requirements of the federal environmental laws, in order to protect Suffolk County's waters.

## II.

## PARTIES

10.      Plaintiff Peconic Baykeeper, Inc. ("Baykeeper") is a member-supported, not-for-profit organization dedicated to protecting and restoring Long Island's drinkable, swimmable, and fishable waters. Established in 1998 as Long Island's clean water advocate, Baykeeper uses

science, education and law to defend critical watersheds from the tips of the Twin Forks through the Great South Bay.  Baykeeper works actively with civic groups, baymen, businesses, children, and the community at large to advance coastal conservation.  Baykeeper accomplishes its mission, in part, through conservation and management initiatives, public education, research, monitoring and participation in the public environmental review of projects and activities that may adversely impact the ecological health of the region's estuarine waters.  Baykeeper acts to safeguard and enhance sustainable commercial, recreational and subsistence uses of estuary systems and their watersheds, in furtherance of the interests of its members and supporters.

11.     Soundkeeper, Inc. is a member-supported, non-for-profit organization, founded in 1987, whose mission is to protect and enhance the biological, physical, and chemical integrity of Long Island Sound through education, projects, and advocacy. Soundkeeper's members include a broad cross-section of the public, including commercial fishermen, boaters, swimmers, recreational fishers, marine industry members, shellfish harvesters, birders, and other interested members of the public.

12.     Both Baykeeper's and Soundkeeper's members use and enjoy the waters which Defendant has unlawfully polluted and is unlawfully polluting to fish, sail, boat, kayak, swim, birdwatch, photograph, view wildlife and engage in nature study and scientific study, among other activities.  Many of Baykeeper's and Soundkeeper's members live on or near the Great South Bay, Belmont Lake, Carlls River, the Long Island Sound, and their tributaries, and recreate upon and alongside these water bodies.  They eat fish and shellfish grown and caught in Suffolk County's harbors, and at times are prevented from consuming these fish and shellfish because of water pollution caused in part by the excessive discharge of nitrogen from Defendant's facilities.  Water quality in these waterbodies directly affects the health,

4

recreational, aesthetic, commercial, and environmental interests of Baykeeper's and Soundkeeper'smembers.

13.     In addition, like other residents of Suffolk County, Baykeeper's and Soundkeeper's members also rely on the groundwater below Suffolk County as their sole source of drinking water.  When Defendant discharges sewage into that groundwater without any effort at denitrification, Defendant compromises the safety of this water supply.

14.     The interests of Baykeeper's and Soundkeeper's members are being, and will be, adversely affected by Defendant's failure to comply with the requirements of the CWA, RCRA, and SDWA.  The relief sought herein will redress the harms to Plaintiffs and their members caused by Defendant's activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs and their members, for which harm they have no plain, speedy or adequate remedy at law.

15.     Defendant New York State Office of Parks, Recreation, and Historic Preservation ("State Parks") is a governmental agency of the State of New York.  It controls and has jurisdiction over the five state parks identified in this complaint.

### III.

### STATUTORY FRAMEWORK

### The Clean Water Act and NPDES Permits

16.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA Section 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

17.     The CWA prohibits the "discharge of any pollutant" from a "point source" into

the waters of the United States without a NPDES permit issued pursuant to Section 402 of the CWA. 33 U.S.C. §§ 1311(a), 1342.

18.     Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

19.     Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, among other things, "biological materials" and "chemical wastes" discharged into water.

20.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

21.     A discharge of pollutants from a point source to navigable waters is covered by the Clean Water Act even if the route that the pollution travels from the point source to the navigable water is underground, traveling through groundwater.  Groundwater acts as a conduit, conveying pollution from the point source of discharge to the navigable waters.  EPA, the agency charged by Congress with interpreting and applying the Clean Water Act, has consistently explained that the CWA applies "to discharges of pollutants from a point source via ground water that has a direct hydrologic connection to surface water."  EPA, *National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitation Guidelines and Standards for Concentrated Animal Feeding Operations*, 66 Fed. Reg. 2960, 3017 (Jan. 12, 2001).  Accordingly, the Clean Water Act requires NPDES permit coverage where pollutants are discharged to groundwater that is directly hydrologically connected to surface water.

22.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

6

23.    40 C.F.R. § 122.2 defines "waters of the United States" to include, among other things: (i) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (ii) all interstate waters; (iii) tributaries to such waters; (iv) wetlands adjacent to such waters or their tributaries; and (v) all other waters the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce.

24.    A NPDES permit issued pursuant to Section 402 of the CWA must include effluent limits based on the performance achievable through the use of statutorily-prescribed levels of technology that "will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants." 33 U.S.C. § 1311(b)(2)(A)(i), *see also id*. § 1311(b)(1)(A); *id.* § 1342 (stating that NPDES must require compliance with § 1311).

25.    Further, if despite application of stringent, technology-based treatment standards, a discharge still has the reasonable potential to cause or contribute to a violation of water quality standards, then the permitting agency must also include any limits in the NPDES permits necessary to ensure that water quality standards are maintained and not violated. *See* 40 C.F.R. § 122.44(d). Such additional limits are generally referred to as Water Quality Based Effluent Limits ("WQBELs").

26.    In order to determine whether a discharge causes or contributes, or has the reasonable potential to cause or contribute to a violation of water quality standards, a NPDES permitting agency engages in a process commonly called a "reasonable potential analysis." A reasonable potential analysis is a necessary prerequisite to issuance of a Section 402 permit. It is described by federal regulations at 40 C.F.R. § 122.44(d)(1)(ii).

27.    NPDES permits are issued by EPA or by States that have been authorized by EPA

to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  *See* 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

28.     In New York, DEC has been delegated the authority to issue NPDES permits pursuant to Section 402 of the CWA.

### New York's Environmental Conservation Law and State Water Pollution Permits

29.     New York's Environmental Conservation Law ("ECL") creates two tiers of water pollution permits: federally delegated NPDES permits that meet the requirements of Section 402 of the Clean Water Act ("federally-delegated NPDES permits"), and permits that are issued only under the state's ECL ("State ECL permits").  The discrepancy arises because the Environmental Conservation Law is broader than the Clean Water Act and covers certain discharges that are not within the jurisdiction of the Clean Water Act.  New York decided to apply different permitting standards to discharges that are subject to the Clean Water Act and to discharges that are regulated only by state law.

30.     Since both kinds of permit are issued pursuant to the ECL's "State Pollutant Discharge Elimination System," both types of permits are commonly (and confusingly) referred to as "SPDES permits."  But not all SPDES permits are alike.  Federally-delegated NPDES permits and State ECL permits differ in several important respects.

31.     For example, federally-delegated NPDES permits must be issued for fixed terms not to exceed five years.  33 U.S.C. § 1342(b)(1)(B).  State ECL permits are valid for up to ten years.  ECL § 17-0817(1).

32.     Also, only DEC may issue a federally-delegated NPDES permit.  EPA did not authorize DEC the power to re-delegate any authority that had been delegated to it.  DEC has

8

responsibility for issuing, reviewing, and modifying each federally-delegated NPDES permit, a process which must being with a draft permit subject to public notice. *See* 40 C.F.R. §§ 124.5(a), (e). While DEC has delegated authority to Suffolk County to issue certain State ECL permits, such permits are not federally-delegated NPDES permits.

33.     Further, the memorandum of agreement between EPA and DEC delegating authority for the NPDES program requires that a copy of every federally-delegated permit be sent from DEC to EPA. EPA is not required to, and does not routinely, receive copies of state ECL permits.

34.     The Environmental Conservation Law lists many of the key substantive features required of a federally-delegated NPDES permit issued by DEC. Among other things, when DEC issues a federally-delegated NPDES permit, the permit must:

- "contain applicable effluent limitations as required by [the CWA]" (ECL § 17-0809(1));

- include "any further limitations necessary to insure compliance with water quality standards adopted pursuant to state law" (ECL § 17-0811(5));

- include "recording, reporting, monitoring, and sampling requirements applicable under the [Clean Water] Act" (ECL § 17-0815(8)); and

- be reviewed "at least once every five years…for conformance with new federal treatment technology, new state water quality classifications, and water quality standards." ECL § 17-0817(3).

## The Resource Conservation and Recovery Act

35.     Enacted in 1976, the declared purpose of RCRA is to prohibit the treatment, storage, and disposal of solid wastes in a manner that may present an imminent and substantial endangerment to human health or the environment. 42 U.S.C. § 6902(a).

36.     In Section 6901(b)(2), Congress specifically highlighted the potential danger to human health and the environment of solid waste disposal without careful planning and management.  *Id.* at § 6901(b)(2).

37.     Accordingly, RCRA categorically prohibits the handling, transportation, and disposal of any "solid waste" in a manner that "may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. §6972(a).

38.     The term "solid waste" is defined as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities…." *Id.* at § 6903(27).

<u>**Safe Drinking Water Act**</u>

39.     Congress enacted the Safe Drinking Water Act in 1974 to ensure a safe drinking water supply for the public.  *See* 42 U.S.C. § 300(f).

40.     The Safe Drinking Water Act prohibits any underground injection of waste that would endanger any drinking water source.  *See* 33 U.S.C. § 300h(b)(1).  "Underground injection endangers drinking water sources if such injection may result in the presence in underground water which supplies or can reasonably be expected to supply any public water system of any contaminant, and if the presence of such contaminant may…adversely affect the health of persons."  33 U.S.C. § 300h(d)(2).

41.     To ensure the safety of underground sources of drinking water, the SDWA established an underground injection control ("UIC") program.  *See* 42 U.S.C. § 300h; 40 C.F.R. Part 144 ("Underground Injection Control Program").

42. EPA administers the UIC program in New York. *See* 40 C.F.R. § 147.1651(a).

43. Both "large septic tanks" and "large cesspools" – those that have the capacity to serve more than twenty people per day – fall into the category of "Class V" injection wells, and are subject to control under the UIC program. *See* 40 C.F.R. § 144.1(g)(1), (2). The UIC program imposes a number of important constraints on these wells.

44. First, the UIC program categorically prohibits the operation of large cesspools, such as those at Defendant's parks. All owners of large cesspools were required to close them by April 5, 2005. *See* 40 C.F.R. §§ 144.85(a), 144.88(a).

45. Second, the UIC program prohibits the underground injection of waste into any other kind of Class V well unless it is authorized by a permit, or a permit by rule. *See* SDWA § 1421(b)(1)(A), 42 U.S.C. § 300h (b)(1)(A). *See also* 40 C.F.R. § 144.11 ("Any underground injection, except into a well authorized by rule or except as authorized by permit issued under the UIC program, is prohibited.").

46. Third, EPA has created a "prohibition of fluid movement standard" that applies to all Class V injection wells:

> "No owner or operator shall construct, operate, maintain, convert, plug, abandon, or conduct any other injection activity in a manner that allows the movement of fluid containing any contaminant into underground sources of drinking water, if the presence of that contaminant may cause a violation of any primary drinking water regulation under 40 CFR part 142 or may otherwise adversely affect the health of persons. The applicant for a permit shall have the burden of showing that the requirements of this paragraph are met."

40 C.F.R. § 144.12.

47. Class V injection wells are not authorized by rule, and must be closed or covered by an individual UIC permit, if their operation violates the "prohibition of fluid movement" standard. *See* 40 C.F.R. § 144.84(b)(1). Thus, if Defendant's operation of large septic systems

allows the movement into "underground sources of drinking water" of a contaminant that "may cause a violation of any primary drinking water regulation" or "may otherwise adversely affect the health of persons," Defendant must either close the septic system or obtain UIC permit coverage from EPA.  40 C.F.R. § 144.12.

### Citizen Enforcement

48.     The CWA, SDWA, and RCRA all include provisions for citizen enforcement.

49.     Under CWA Section 505(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.  33 U.S.C. § 1365(a)(1).

50.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of Section 301 of the CWA, 33 U.S.C § 1311.  *See* CWA Section 505(f), 33 U.S.C. § 1365(f).

51.     Injunctive relief is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

52.     Violators of the Clean Water Act are also subject to an assessment of civil penalties of up to $32,500 per day per violation (for violations occurring between March 15, 2004 and January 12, 2009), and up to $37,500 per day per violation (for violation occurring after January 12, 2009).  *See* 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4.

53.     Under the SDWA, any person may commence a civil suit under his own behalf against any person, the Administer for failure to perform a non-discretionary duty, or for the collection of penalties against an agency.  SDWA § 1449(a), 42 U.S.C. § 300j-8(a).

54.     The court has broad authority to enforce "any requirement prescribed by or under" the SDWA.  42 U.S.C. §300j-8(a).

55.     Under RCRA § 6972, any person may commence a civil action against "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal or any solid or hazardous waste which may present an imminent or substantial endangerment to health of the environment."  42 U.S.C. 6972(a)(1)(B).

56.     Violators of the RCRA are subject to an assessment of civil penalties of up to $32,500 per day per violation (for violations occurring between March 15, 2004 and January 12, 2009), and up to $37,500 per day per violation (for violation occurring after January 12, 2009). *See* 42 U.S.C. § 6928(g) and 40 C.F.R. §§ 19.1–19.4.

57.     In addition to issuing civil penalties for violation of RCRA, the court is authorized to grant broad injunctive relief, including to order compliance with RCRA, to restrain a person who is causing an imminent and substantial endangerment, and to require that person to take any other necessary action to abate the endangerment.  *See* 42 U.S.C. § 6972(a).

58.     Declaratory relief in citizen suits generally is authorized by 28 U.S.C. § 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

## IV.

## FACTS

### The Severe Nitrogen Pollution Crisis in Suffolk County

59.     Suffolk County's coastal waters – its bays, harbors, rivers and creeks – are not meeting state water quality standards and are not supporting important uses such as swimming, fishing, boating, and shellfish consumption because of nitrogen pollution.

60.     In 2012, the New York DEC concluded that much of the Peconic Estuary watershed, the Long Island Sound, and much of the South Shore Estuary, including the Great South Bay, Moriches Bay, Shinnecock Bay and Quantuck Bay, and most of their major tributaries in Suffolk County are impaired by excessive levels of nitrogen. With the exception of the Atlantic Ocean, DEC now considers nearly every major waterbody in and around Suffolk County to be nitrogen impaired.

61.     These impairments are driven by wastewater from septic systems.  Throughout the county, facilities that are not connected to sewage treatment plants discharge inadequately treated human waste into groundwater.

62.     Nitrogen discharged from septic systems contaminates groundwater, the only source of drinking water on Long Island.  In many parts of the island, nitrogen levels in the uppermost groundwater aquifer already exceed the 10 milligram per liter (mg/L) standard set by EPA in its primary drinking water regulations (which standard New York State has also adopted for Suffolk and Nassau Counties).  *See* 40 C.F.R. § 141.62; *see also* 6 NYCRR § 703.6(e)..  Nitrogen levels are rising rapidly in Suffolk County's two deeper aquifers as well.

63.     A great deal of the nitrogen discharged from septic systems is conveyed swiftly and directly by groundwater into the nearest surface waters of Suffolk County, including Long Island Sound, the Great South Bay, Peconic Bay, and all of their tributaries.  According to a 2011 study conducted by researchers at Boston University's Marine Biological Laboratory, 70% of the nitrogen discharged from land into the Great South Bay comes from wastewater systems.

64.     When this excess nitrogen reaches coastal waters, it triggers algal blooms that reduce oxygen levels and water clarity, release foul odors, damage aquatic vegetation, kill fish, and produce toxic "red tides" and "brown tides" that endanger human health and make shellfish

inedible.

65.     Suffolk County has an extraordinary number of large septic systems that contribute to this problem.  Out of approximately 4,500 septic systems in New York State that are large enough to discharge more than 10,000 gallons of sanitary waste daily, more than 2,000 are in Suffolk County.  Most of these septic systems discharge between 10,000 and 30,000 gallons of sanitary waste a day.  But thirty of these septic systems are massive: they are permitted to discharge more than 30,000 gallons of sanitary waste daily.

### Defendant's Septic Systems and Discharges

66.     The Defendant has the dubious distinction of operating more massive septic systems than any other entity in Suffolk County – five out of the thirty systems in this class. Five state parks located in Suffolk County, Long Island discharge polluted wastewater from cesspools and large septic tanks into groundwater and waters of the United States:  Hecksher State Park; Robert Moses State Park; Belmont Lake State Park; Sunken Meadow State Park; and Wildwood State Park.  Together, the five parks are discharging up to 246,000 gallons per day of wastewater from septic tanks and cesspools into Long Island's ground and surface waters.  By way of comparison, a single home septic tank typically discharges up to 300 gallons of wastewater daily. These five state parks have an impact equivalent to adding an entire unsewered village to Suffolk County.  Worse yet, the concentration of nitrogen in the parks' discharges is far greater than in household sewage.

67.     The waste that Defendant's discharges at the parks contains a number of pollutants that are frequently found in human waste.  In addition to nitrogen, which may be present in the form of ammonia, ammonium, nitrate, nitrite, or other nitrogenous molecules, other contaminants in Defendant's discharges include, but are not limited to: phosphorus and other nutrients that can cause

or contribute to eutrophication of downstream waters; organic material and other wastes that create chemical and biological oxygen demand in receiving waters; bacteria; viruses; metals including aluminum, calcium, cadmium, copper, chromium, iron, magnesium, molybdenum, nickel, lead and zinc; substances that alter soil and groundwater pH; and a variety of pharmaceuticals; drugs, medications, antibiotics, and hormones.

68.   Many of the pharmaceuticals in Defendant's discharges are endocrine disrupting chemicals, including nonylphenol, octylphenol, and some of their ethoxylated chains, $17\beta$ – estradiol, estriol, $17\alpha$– ethynylestradiol, and bisphenol-A.  These endocrine-disrupting chemicals can cause significant harm to aquatic organisms.

69.   Defendant's discharges contaminate the drinking water aquifer immediately below all of the parks, except perhaps Robert Moses State Park.  (Although Defendant is also contaminating the groundwater below Robert Moses State Park – and through it, the Great South Bay and the Atlantic Ocean – the water underneath that park may not be an underground source of drinking water.)

70.   Water quality samples collected by the government of Suffolk County show severe and increasing nitrogen contamination in groundwater throughout large parts of the county.  Nitrogen pollution has rendered large swaths of the County's uppermost groundwater aquifer nonpotable, meaning that nitrogen concentrations exceed the EPA's Maximum Contaminant Level of 10 milligrams per liter (mg/L) (also adopted by the Suffolk County Department of Health).   Even larger areas of the aquifer, while presently potable, exceed the water quality protection targets of 4 mg/L or 6 mg/L of nitrogen that Suffolk County established to protect the long-term potability of this aquifer.

71.   The Suffolk County Department of Health Services has found wells impacted by

16

nitrogen contamination throughout the County, including twenty public water supply wells screened in the upper glacial aquifer and located through Suffolk County where samples show nitrate concentrations greater than 10 mg/L.  The wastewater systems at Robert Moses, Sunken Meadow, and Wildwood State Parks all discharge nitrogen and other pollutants into areas of severely impacted groundwater.

72.     In addition to contaminating the aquifers underlying Suffolk County, the nitrogen discharged by the Defendant also migrates swiftly into the nearest surface waters, which include the Great South Bay, Belmont Lake, and the Carlls River, Long Island Sound, and wetlands adjacent to several of the parks.

73.     All of the listed parks are located in areas that the government of Suffolk County has identified as areas that rapidly contribute groundwater to surface waters.  Specifically, wastewater discharged into the groundwater below these parks reaches the nearest surface waters in not more than two years.  Given the very short distances involved, and the sandy, porous soils under the Parks, Baykeeper and Soundkeeper allege that most of the wastewater travels quicker than two years.

74.     Hecksher State Park's wastewater discharges via sandy soil into onsite wetlands and the Great South Bay.  The wastewater from some of that park's septic systems travels through less than 200 feet of groundwater to reach wetlands.  The distance from the point of discharge to the Great South Bay varies from 200 feet to 4,000 feet.

75.     The wastewater system at Robert Moses State Park discharges septic waste into groundwater that flows through the sand of Fire Island and then into the Atlantic Ocean, the Great South Bay, and Fire Island Inlet.  The septic system closest to the water discharges through 100 feet of sand into the Fire Island Inlet.  The septic tank farthest from the water is still only 400 feet from the Atlantic Ocean.

76.     At Belmont Lake State Park, the cesspools discharge into groundwater that is directly connected to both Belmont Lake and the Carlls River, as well as to wetlands that border the northern and western sides of the lake.  Polluted waste flows through sand and gravel-based soils for 300-1,250 feet before reaching the lake and river, which flow down to the Great South Bay.  The cesspools on the western side of Belmont Lake, in the maintenance and administration buildings, are less than 100 feet from wetlands.

77.     The wastewater systems at Sunken Meadow discharge into groundwater that flows through sand to the Nissequogue River that bisects the park, to the wetlands south and east of the park, and into the Long Island Sound. The septic tanks are located between 250 feet and 1,400 feet from the Sound.

78.     The wastewater discharged at Wildwood State Park flows through sand and into Long Island Sound. The park's septic tanks and cesspools are located between 100 feet and 1,500 feet from the Sound.

79.     All of these receiving waters are already adversely affected by high levels of nitrogen.

80.     The high levels of nitrogen found in the Great South Bay and Long Island Sound have caused DEC to classify them as "impaired waters" pursuant to the CWA.  33 U.S.C. §§ 303(d), 305(b).

81.     DEC has determined that the lower Nissequogue River is impacted by pathogens and nutrients released from inadequate wastewater treatment systems.  The Nissequogue flows into Long Island Sound, delivering those nutrients into the Sound's nitrogen-impaired waters.

82.     Belmont Lake and the Carlls River are not currently designated as impaired, but DEC has determined that past water quality sampling of Belmont Lake shows moderate to elevated nitrate

levels.  Further, Belmont Lake and the Carlls River both drain into the Great South Bay, which is impaired.

83.     Thus, the wastewater systems at all five parks contribute to the impaired status of the Great South Bay and Long Island Sound.

**<u>Technologies to Address Defendant's Discharges</u>**

84.     Fortunately, nitrogen levels in Defendant's wastewater discharges can be drastically reduced through the use of commercially available state-of-the-art technologies recently endorsed by EPA and approved for use by Suffolk County.

85.     In 2010, EPA determined that commercially available denitrification systems regularly reduce nitrogen concentrations below 5 mg/L and as low as 2.2 mg/L.  In 2011, Suffolk County approved the use of such systems, declaring their performance to be "exceptional" because they can reduce nitrogen concentrations to the 2-3 mg/L range.

86.     These modern denitrification systems are just a few of the many nitrogen control options that could be readily implemented at Defendant's parks.

87.     Unfortunately, however, these technologies are not in use at Defendant's massive septic systems today, and it does not appear that Defendant seriously intends to implement them in the future.

88.     Presently, Defendant is not even keeping its existing septic systems in good condition.  In response to a letter sent by Baykeeper and Soundkeeper to Defendant with a copy to DEC, Defendant and DEC recently inspected Defendant's parks and discovered that the Defendant: misidentified, failed to report, or inaccurately described the outfalls (points of discharge) from its septic systems to DEC; misreported the discharges from these systems or failed to report them entirely; operates septic systems above capacity; and has failed to properly operate and maintain

septic systems at all five parks.

89.      In addition, while Baykeeper and Soundkeeper's review of DEC records led them to believe that Defendant operated large cesspools – the most primitive form of sewage disposal possible – at three of the five parks that are the subject of this complaint, the recent inspections uncovered large cesspools at all five parks.

**Defendant Is Operating Without NPDES Permits**

90.      Currently, Defendant operates septic systems at all five parks pursuant to State ECL permits issued by DEC (three of which have expired):

| State Park | Permit Number | Effective Date | Expiration Date |
| --- | --- | --- | --- |
| A.E.S. Sunken Meadow | NY-0177270 | 6/29/2005 | 6/28/2010[1] |
| Belmont Lake | NY-0177393 | 1/1/2012 | 5/31/2017 |
| Hecksher | NY-0177571 | 6/1/2010 | 2/28/2017[2] |
| Robert Moses | NY-0194808 | 3/1/2002 | 3/1/2007 |
| Wildwood | NY-0175366 | 9/23/2005 | 9/22/2010 |

91.      These State ECL permits are not NPDES permits issued pursuant to Section 402 of the Clean Water Act.

92.      These permits were not designed to authorize discharges to waters of the United

---

[1] This permit was provided to Baykeeper by DEC in response to a New York State Freedom of Information Law ("FOIL") request. DEC published notice of its intent to renew this permit in 2009, but Baykeeper and Soundkeeper do not know whether the renewal was ever completed. Baykeeper and Soundkeeper requested that DEC provide the most current permit for Sunken Meadow State Park and received this permit from DEC. On that basis, Baykeeper and Soundkeeper allege that this is the most recent permit state ECL permit for Sunken Meadow and that Defendant is operating septic systems at that park on an expired State ECL permit.

[2] A later expiration date, May 31, 2020, is marked on most pages of the permit.

States in compliance with the Clean Water Act, and do not impose conditions on the discharges that are necessary to protect waters of the United States and conform to federal law.

93.     The permits for Belmont Lake, Hecksher, and Robert Moses State Parks were issued by Suffolk County, not DEC.

94.     The permits for Belmont Lake and Robert Moses State Parks were issued without the public notice required under the Clean Water Act.

95.     The permit for Hecksher State Park was initially issued for ten years, and then modified to set a term of seven years.

96.     DEC did not transmit final copies of any of these permits to EPA when they were issued, or within a short period thereafter.

97.     None of these permits meet the basic criteria of a federally delegated NPDES permit.

98.     The permits do not contain technology-based effluent limitations on the discharge of nitrogen (as required by Section 301 of the Clean Water Act).

99.     They do not contain water quality based effluent limitations.

100.    There is no indication in the files provided by DEC pursuant to New York State Freedom of Information Law ("FOIL") requests that the permit issuing authority (whether DEC or Suffolk County) ever conducted a "reasonable potential analysis," even though the Defendant's facilities all discharge nitrogen into waterbodies that are impaired by excess nitrogen.  On this basis, Baykeeper and Soundkeeper allege that these permits were issued without the permit issuing authority first conducting a reasonable potential analysis.

101.    These permits do not impose any recordkeeping, reporting, monitoring, or sampling requirements.

102.    These permits are neither reviewed nor renewed once every five years.

103.    There is no indication that these permits were designed to be or were ever treated by DEC as federally delegated NPDES permits. These permits were clearly drafted as State ECL permits.  Since these permits were not designed as federally-delegated NPDES permits that meet federal standards, they cannot authorize a charge of pollutants into waters of the United States.

### Defendant Received Adequate Notice of this Action

104.    As of July 16, 2013, Defendant did not have NPDES or UIC permit coverage at any of the parks.

105.    As of July 16, 2013, Baykeeper and Soundkeeper were aware that Defendant operated large cesspools at Wildwood, Belmont Lake, and Hecksher State Parks (and have since learned that Defendant continues to operate large cesspools at all five parks).

106.    As of July 16, 2013, Defendant had not taken any steps to obtain UIC or NPDES permit coverage, to close the large cesspools at these parks, or to reduce the discharge of nitrogen from these parks.

107.    Accordingly, on July 16, 2013, Baykeeper and Soundkeeper notified Defendant that it was in violation of the Clean Water Act, the Safe Drinking Water Act, and the Resource Conservation and Recovery Act, and that they intended to bring suit to enforce these laws unless Defendant cured these violations.

108.    Copies of that notice were also sent to the Acting Administrator of the EPA, the Administrator of EPA's Region II office; the Commissioner of DEC, and the New York Attorney General.  A true and correct copy of Plaintiffs' notice letter is incorporated by reference and attached to this complaint as Exhibit A.

109.    After receiving notice of Baykeeper and Soundkeeper's intent to sue, Defendant

entered into a consent order with DEC.  A copy of that consent order is attached to this complaint as Exhibit B.

110.    The consent order between DEC and Defendant addresses certain state law water pollution violations connected to the septic systems at Defendant's parks, but does not resolve the violations of federal law alleged in this complaint.  Moreover, it does not address the fundamental problem with Defendant's septic systems: the Defendant discharges uncontrolled volumes of nitrogen into an environment that cannot take it.

111.    The consent order states that Defendant: misidentified, failed to report, or inaccurately described the outfalls (points of discharge) from its septic systems to DEC; misreported the discharges from these systems or failed to report them entirely; operates septic systems above capacity; and has failed to properly maintain septic systems at all five parks.  *See* Consent Order ¶ 21.

112.    While the order recognizes these failings as violations of the Environmental Conservation Law, the Consent order describes Defendant's discharges only as discharges to waters of the State of New York, without noting that Defendant also is discharging pollutants to waters of the United States.  *See* Consent Order ¶ 12.

113.    The consent order also reveals that Defendant operates large cesspools at all five parks.  *See* Consent Order ¶ 11 and Appendix A.

114.    Although the consent order states that "large-capacity cesspools violate the UIC program," it also recognizes that EPA, not DEC, administers the Safe Drinking Water Act's UIC program.  Consent Order Finding I(a); *see also id.* ¶ 8.

115.    In exchange for completely resolving the violations of state law noted in the consent order, Defendant is required to pay a civil penalty of $25,000 (with a further $25,000

penalty suspended pending Defendant's adherence with the order); spend $250,000 on undetermined "Environmental Benefit Projects" that are supposed to improve groundwater quality in Suffolk County through public education or construction of improvements; close its large cesspools; and, over the next three years, close all of its cesspools and make a series of repairs or replacements to seven septic systems that are in poor condition at Wildwood and Hecksher State Parks.

116.    Unfortunately, the recent consent order between Defendant and DEC does not:

- require Defendant to reduce its discharges of nitrogen to levels attainable through the use of readily available commercial denitrification technologies;

- impose monitoring requirements to track and respond to Defendant's discharges of nitrogen into underground drinking water sources and coastal waters; or

- require Defendant to seek or obtain coverage under a federally delegated NPDES permit (or provide a schedule for DEC to modify, revoke, or reissue Defendant's existing State ECL permit to conform it to the requirements of Section 402 of the Clean Water Act);

- address Defendant's violations of the Safe Drinking Water Act, including Defendant's discharge of nitrogen in volumes and concentrations that endanger underground sources of drinking water;

- address, in any way, Defendant's improper disposal of solid waste in a manner that continues to imminently and substantially endanger health and the environment, in violation of RCRA.

117.    Defendant's violations of the Clean Water Act, Safe Drinking Water Act, and Resource Conservation and Recovery Act are ongoing and continuous, are capable of repetition,

and result from an underlying cause – Defendant's significant discharges of nitrogen to groundwater and to Suffolk County's nitrogen-impaired surface waters – that is not addressed by the consent order hastily agreed to by the Defendant and DEC.

## V.

### JURISDICTION AND VENUE

118.    This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), ), Section 7002(a) of the RCRA, 42 U.S.C. § 6972(a), Section § 1449(a)of the SDWA, 42 U.S.C. 300j-8(a) , and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

119.    Plaintiff has complied with the notice requirements under Section 505(b)(1) of the CWA, 33 U.S.C. § 1365(b)(1), Section 7002(b)(1) of RCRA, 42 U.S.C. § 6972(b)(1), and Section 1449(b) of the SDWA, 42 U.S.C. § 300(j)(8)(b).

120.    On July 16, 2013, Plaintiffs provided notice of Defendant's violations of the Act and of their intention to file suit against Defendant, to Defendant; its registered agent; the Acting Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of DEC.  A true and correct copy of Plaintiff's notice letter is attached as Exhibit A and incorporated by reference.

121.    More than ninety days have passed since the notice letter was served on Defendant and the state and federal agencies.

122.    Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B); RCRA § 7002(b)(1)(B), 42 U.S.C. § 6972(b)(1)(B); SDWA § 1449(b)(1)(B), 42 U.S.C. § 300j-8(b)(1)(B).

123.    This action is not barred by prior administrative penalty under Section 309(g) of

the Act, 33 U.S.C. § 1319(g) because Plaintiffs seek declaratory and injunctive relief and, in any

case, this action is brought within 120 days of the date on which Plaintiffs' original notice of

intent to sue was given.  *See* 33 U.S.C. § 1319(g)(6) (imposition of administrative penalty

precludes only "civil penalty actions" and, in cases where the administrative penalty is imposed

after notice of intent to sue is given, the preclusion of civil penalties only applies to actions

brought more than 120 days after the date of the original notice.).

124.    Venue is proper in the Eastern District of New York pursuant to Section 505(c)(1)

of the CWA, 33 U.S.C. § 1365(c)(1), Section 7002(a) of the RCRA, 42 U.S.C. § 6972(a),

Section § 1449 of the SDWA, 42 U.S.C. §300j-8(a), and 28 U.S.C. § 1391(b)(2) because, *inter

alia*, the source of pollution is located in this judicial district.

## VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Unauthorized Discharge of Pollutants
### (Violations of Clean Water Act
### 33 U.S.C. §§ 1311, 1342)

125.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

126.    Defendant is not authorized to discharge pollutants from a point source to waters

of the United States unless authorized by a federally delegated NPDES permit issued in

compliance with Section 402 of the Clean Water Act.

127.    The septic tanks and cesspools in Hecksher State Park, Robert Moses State Park,

Belmont Lake State Park, Sunken Meadow State Park and Wildwood State Park are point sources of

water pollution.

128.     Defendant has discharged and continues to discharge pollutants, including nitrogen and bacteria, to waters of the United States from those point sources without a NPDES permit.

129.     Those pollutants enter the surrounding groundwater, which is directly hydrologically connected to waters of the United States.

130.     The groundwater acts as a conduit to swiftly convey these pollutants through a few hundred feet of sandy soil and then into Long Island Sound, the Great South Bay, and their tributaries, including the Nissequogue River, Belmont Lake, and Carlls River, as well as into wetlands adjacent to these waterbodies.

131.     The permits issued by DEC to Defendant for operation of its septic systems are state ECL permits, not federally delegated NPDES permits.

132.     Each and every day on which Defendant discharges pollutants associated with human sanitation wastes without authorization under a NPDES permit is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

133.     Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiffs and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

134.     Wherefore, Plaintiffs pray for relief as hereinafter set forth.

**SECOND CAUSE OF ACTION**

**Operating Large Capacity Cesspools**
**(Violations of Safe Drinking Water Act**
**42 U.S.C. § 300h and 40 C.F.R. § 144.85)**

135.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

136.     State Parks failed to close large cesspools at all five state parks by April 5, 2005, as required by the federal UIC program.  *See* 40 C.F.R. §§ 144.85(a), 144.88(a).

137.    State Parks' continued operation of large cesspools is illegal. In accordance with 40 C.F.R. § 144.89, the wells must be closed off and safer disposal practices implemented as soon as possible.

138.    Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiffs and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

139.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION

**Operating Class V Wells Without a Permit and
Endangering Underground Sources of Drinking Water**

**(Violations of Safe Drinking Water Act
42 U.S.C. § 300h and 40 C.F.R. §§ 144.12 and 144.84)**

140.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

141.    Defendant's large septic systems at Belmont Lake, Hecksher, Sunken Meadow, and Wildwood State Parks violate EPA's "prohibition of fluid movement" standard because they allow the movement into "underground sources of drinking water" of nitrogen, a contaminant that "may cause a violation of any primary drinking water regulation" or "may otherwise adversely affect the health of persons."  40 C.F.R. § 144.12.

142.    An underground source of drinking water is an "aquifer or its portion: (a)(1) Which supplies any public water system; or (2) Which contains a sufficient quantity of ground water to supply a public water system; and (i) Currently supplies drinking water for human consumption; or (ii) Contains fewer than 10,000 mg/l total dissolved solids; and (b) Which is not an exempted aquifer." 40 C.F.R. § 144.3.

143.    The shallow aquifer that underlies the main body of Long Island, including

28

Belmont Lake, Hecksher, Sunken Meadow and Wildwood State Parks, is an underground source of drinking water because it supplies public water systems, contains a sufficient quantity of groundwater to supply public water systems, currently supplies drinking water for human consumption at private wells, contains fewer than 10,000 mg/L total dissolved solids, and is not an exempted aquifer under the SDWA.

144.  Nitrogen is a contaminant that may cause violation of a primary drinking water regulation.  EPA has established a primary drinking water regulation that limits the concentration of nitrogen in drinking water aquifers to 10 milligrams per Liter (mg/L).  *See* 40 C.F.R. § 141.62.

145.  Defendant is discharging nitrogen at concentrations greatly exceeding 10 mg/L into an aquifer that, in many portions, already contains more than 10 mg/L of nitrogen, and in other portions exceeds the precautionary standards that Suffolk County has established to ensure that the aquifer's nitrogen concentration never reaches the 10 mg/L limit.

146.  Further, in addition to violations of the primary drinking water regulation for nitrogen, Defendant's daily injection of thousands of gallons of sanitary wastes into potable aquifers causes large volumes and high concentrations of bacteria, synthetic hormones, and other contaminants to enter these drinking water sources.  These pollutants may adversely affect the health of persons.

147.  Finally, nitrogen injected into groundwater from Defendant's wells flows through the drinking water aquifer and into the coastal waters of Long Island, where it contributes to harmful algal blooms and shellfish poisonings that can adversely affect the health of persons.

148.  Therefore, Defendant is illegally operating Class V injection wells at Belmont Lake, Hecksher, Sunken Meadow and Wildwood State Parks without a permit and endangering underground sources of drinking water.  Defendant must either close these septic systems

permanently, or significantly decrease its nitrogen discharges and obtain appropriate UIC permit coverage from EPA.  *See* 40 C.F.R. 144.84(b)(1).

149.     Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiffs and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

150.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### Imminent and Substantial Endangerment of Health and the Environment
### (Violations of RCRA, 42 U.S.C. § 6972)

151.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

152.     Defendant's injection of nitrogen-rich human waste into shallow groundwater endangers underground sources of drinking water and contributes to eutrophication and low oxygen levels in Long Island Sound, the Great South Bay, and their tributaries identified above.

153.     The high concentration and large volume of nitrogen discharged from Defendant's cesspools and septic tanks contributes to or triggers algal blooms in these downgradient waterbodies, reduces oxygen levels and water clarity, releases foul odors, damages aquatic vegetation, kills fish, and produces toxic "red tides" and "brown tides" that endanger human health.

154.     Defendant is disposing of solid waste in a manner that may present an imminent and substantial endangerment to health or the environment, in violation of the RCRA.  *See* 42 U.S.C. § 6972(a).

155.     This endangerment is continuing because sanitary waste containing extremely high concentrations of nitrogen continues to leave Defendant's septic tanks and cesspools and because the nitrogen-rich plume of contaminants leaving Defendant's facilities continues to

migrate into both underground sources of drinking water and into the surface waters of Suffolk County.

156.    Every day upon which the placement of contaminants attributable to Defendant's past or present practices continues to pose an imminent and substantial endangerment to health or the environment is a separate violation of the Resource Conservation and Recovery Act.

157.    A separate violation occurs every day at every park.

158.    Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiffs and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

159.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

160.    Wherefore, Baykeeper and Soundkeeper respectfully request that this Court grant the following relief:

(a)    Declare Defendant to have violated and to be in violation of the Clean Water Act, Safe Drinking Water Act, and the Resource Conservation and Recovery Act, as alleged;

(b)    Enjoin Defendant from discharging pollutants from its parks to waters of the United States except as authorized by and in compliance with a NPDES permits;

(c)    Order Defendant to immediately apply for coverage under a NPDES permit for each park;

(d)    Order Defendant to take appropriate actions to remediate the harm caused by the violations of their NPDES permit and the CWA, to the extent possible;

(e)     Enjoin Defendant from operating large cesspools;

(f)     Order Defendant to close its large cesspools in compliance with a schedule determined by this Court;

(g)     Enjoin Defendant from injecting pollutants into groundwater except as authorized by and in compliance with UIC permits;

(h)     Order Defendant to immediately apply for coverage under a UIC permit for the remaining septic systems at each park, or to permanently close these septic systems;

(i)     Order Defendant to reduce its discharge of nitrogen to a level commensurate with use of modern denitrification technologies, which can reduce concentrations to the 2-3 mg/L range, in order to comply with the technology based standards of the Clean Water Act, to prevent endangerment of underground sources of drinking water, and to abate the imminent and substantial endangerment caused by Defendant's disposal of solid waste.

(j)     Order Defendant to pay civil penalties in an amount determined by the Court;

(k)     Order Defendant to pay the costs of litigation, including Plaintiff's reasonable investigative costs, attorneys fees, witness, and consultant fees, and other costs, in accordance with 33 U.S.C. § 1365(d), 42 U.S.C. § 300j-8(a), and 42 U.S.C. § 6972; and

(l)     Award any such other and further relief as this Court may deem appropriate.

Dated this 8th day of  November, 2013          Respectfully submitted,
New York, New York


By:     /s/ Reed W. Super   
            Reed W. Super
            Edan Rotenberg
            Alexandra I. Hankovszky

            SUPER LAW GROUP, LLC
            131 Varick Street, Suite 1033
            New York, NY 10013\
            (212) 242-2355
            reed@superlawgroup.com

            *Attorneys for Plaintiffs*


EXHIBIT A – NOTICE OF INTENT TO SUE

EXHIBIT B – CONSENT ORDER