UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
PECONIC BAYKEEPER, INC. and SAVE
THE SOUND, INC.,

                               Plaintiffs,

      -against-

ERIK KULLESEID, in his official capacity
as Commissioner of the New York State
Office of Parks, Recreation, and Historic
Preservation,

                               Defendant.
-----------------------------------------------------------x

**REPORT AND
RECOMMENDATION**
13-CV-6261 (JMA)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

By way of Complaint dated November 8, 2013, later modified by an Amended

Complaint dated February 21, 2014, Plaintiffs Peconic Baykeeper, Inc. ("Baykeeper")

and Save the Sound, Inc. ("Save the Sound," together with Baykeeper, "Plaintiffs"),

not-for-profit environmental protection organizations, commenced this citizen-suit

action against the Defendant Erik Kulleseid ("Defendant" or "Kulleseid"), the current

Commissioner of the New York State Office of Parks, Recreation, and Historic

Preservation in his official capacity,[1] alleging violations of: (i) the Federal Water

Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251 *et seq*.; (ii)

the Safe Drinking Water Act (the "SDWA"), 42 U.S.C. §§ 300f *et seq*.; and (iii) the

Resource Conservation and Recovery Act (the "RCRA"), 42 U.S.C. §§ 6901 *et seq. See*

---

[1] Plaintiffs substituted the Acting Commissioner as Defendant for the New York State Office of Parks, Recreation, and Historic Preservation in the Amended Complaint. ("Am. Compl."), DE [6]. They also named the previous Commissioner Rose Harvey ("Harvey") as the defendant in this action, but later amended the caption, pursuant to Fed. R. Civ. P. 25(d) to substitute her for the current Commissioner Erik Kulleseid. *See* DE [90].

Complaint, ("Compl.") Docket Entry ("DE") [1]; Amended Complaint ("Am. Compl."), DE [6].  Presently before the Court, on referral from the Honorable Joan M. Azrack is the United States Environmental Protection Agency's (the "EPA") Statement of Interest.  *See* Statement of Interest of United States Environmental Protection Agency ("EPA's Statement of Interest" or "EPA's Motion"), DE [103].   In her September 30, 2021 Order, Judge Azrack construed the EPA's Statement of Interest as motion for reconsideration on Plaintiffs' SDWA claim, DE [107] at 2-3, which this Court recommended dismissing in its 2019 and 2021 Reports and Recommendations ("R&R").  *See* 2019 R&R, DE [81] at 30-33; 2021 R&R, DE [93] at 19-20.  Judge Azrack referred the EPA's Motion to this Court, and for the reasons set forth below, the Court respectfully recommends denying the motion in its entirety.

## I.     BACKGROUND

### A.  Relevant Facts

The Court summarizes facts relevant only to the instant motion.[2]  This case arises from the underground septic systems that collect and dispose of the visitors' sanitary waste at Suffolk County (the "County") parks that Defendant operates (the "Parks"), and the extent to which that waste contributes to the nitrogen pollution impacting the County's groundwater and surrounding navigable waters. *See generally* Am. Compl.

Plaintiffs are member-supported, not-for-profit organizations dedicated to protecting the integrity of Long Island's various bodies of water, and their members

---

[2] For additional background, *see* the 2019 and 2021 R&Rs.

use those waters for recreational and scientific activities, live on or near them, eat seafood grown and caught in the harbors, rely on the County's groundwater for drinking and have economic interests related to the quality of the Long Island Sound and Great South Bay. *See* 2019 R&R at 3; 2021 R&R at 3. Kulleseid is the current Commissioner of the New York State Office of Parks, Recreation, and Historic Preservation, which operates several Suffolk County Parks that welcome an aggregate of over six million annual visitors. *See id*. The Parks are located near several surface waters, including the Great South Bay, Atlantic Ocean, Fire Island Inlet, Smithtown Bay, Long Island Sound and various wetlands. 2019 R&R at 6; 2021 R&R at 3.

The Parks' septic systems are considered "Class V" injection wells pursuant to the SDWA. 2019 R&R at 6; 2021 R&R at 3. These septic systems discharge substances typically found in human waste, such as dissolved organics, chemicals, pathogens and nutrients and the nitrogen discharged by the County's septic systems, including those the Parks maintain. 2019 R&R at 6-7; 2021 R&R at 3. These substances represent a significant source of the nitrogen found in the County's coastal marine waters, which has resulted in adverse water quality conditions causing harm to humans, wildlife and other organisms in the aquatic and marine environment. 2019 R&R at 6-7; 2021 R&R at 3-4. The parties dispute the extent to which the Parks contribute to the overall nitrogen concentration in these waters. 2019 R&R at 7; 2021 R&R at 3-4.

3

Long Island sits atop a large freshwater aquifer, an underground layer of water-bearing permeable rock consisting of multiple layers, with the Upper Glacial Aquifer (the "UGA"), a source of drinking water, at the top. 2019 R&R at 8; 2021 R&R at 4-5. Nearly all groundwater in the UGA that is not extracted through wells ultimately discharges to surface waters. 2019 R&R at 8; 2021 R&R at 5. Generally, groundwater flows downgradient, and no drinking water wells exist downgradient of any of the Parks' septic systems. *See id*. While Defendant maintains that the Parks' Class V injection wells are compliant under New York and federal law, in part, due to the UGA's geography, Plaintiffs and the EPA argue that the wells lack the required permits and violate the endangerment standard under the SDWA and the EPA's implementing regulations. 2019 R&R at 6; 2021 R&R at 4-5; *see also* EPA's Motion at 4-5, 9-11.

### B. Plaintiffs' SDWA Claim

Under the SDWA, the EPA is charged with promulgating "regulations restricting the concentration of [contaminants] in drinking water." *Environmental Def. Fund, Inc. v. Costle*, 578 F.2d 337, 339 (D.C. Cir. 1978). One area of regulation concerns the underground injection control ("UIC") program. *See* 42 U.S.C. § 300h; *see also* 40 C.F.R. § 144 (defining the regulatory framework of EPA administered permit programs); *id*. § 146 (setting forth technical criteria and standards for the UIC program). Under the UIC program, large septic tanks that have the capacity to serve more than 20 people per day, such as the ones located at the Parks, are considered "Class V" injection wells and are subject to various regulations. *See id*. §§

4

144.1(g)(1)(iv), (2)(iii), 144.81(9).  Specifically, the UIC program is designed to prevent underground injections that endanger water sources by introducing contaminants that might cause water systems to be noncompliant with primary drinking water regulations.  *See* 42 U.S.C. §§ 300h(b)(1), (d)(2).  This is known as the "endangerment standard," which states:

> Underground injection endangers drinking water sources if such injection may result in the presence in underground water which supplies or can reasonably be expected to supply any public water system of any contaminant, and if the presence of such contaminant may result in such system's not complying with any national primary drinking water regulation or may otherwise adversely affect the health of persons.

*Id.* at § 300h(d)(2).  Thus, it is prohibited to conduct "injection activity in a manner that allows the movement of fluid containing any contaminant into underground sources of drinking water, if the presence of that contaminant may cause a violation of any primary drinking water regulation."  40 C.F.R. § 144.12(a).  An underground source of drinking water includes a nonexempt aquifer or portion thereof that "supplies any public water system" or "contains a sufficient quantity of ground water to supply a public water system; and (i) [c]urrently supplies drinking water for human consumption; or (ii) [c]ontains fewer than 10,000 mg/L total dissolved solids."  *Id.* § 144.3.  A public water system is "a system for the provision to the public of water for human consumption through pipes or . . . other constructed conveyances," which "includes: any collection, treatment, storage, and distribution facilities."  *Id.* at § 141.2.

If a Class V well might cause a violation of a drinking water regulation, the EPA, among other things, shall "require the injector to obtain an individual permit." *See id*. § 144.12(c)(1). The injector must meet certain criteria for the permit that would exempt the aquifer from underground source of drinking water status thereby deeming it an "exempted aquifer." *See id*. § 146.4. Although the parties agree that the Defendant does not have an aquifer exemption approved by the EPA that would remove the UGA's underground drinking water status, they dispute whether the endangerment standard under the SDWA and the EPA's implementing regulations apply to the UGA in the first instance, which would eliminate the need for such an exemption. *See* EPA's Mot. at 3; Def's Opp. at 4; Pls'. Resp. at 4-5.

The Court determined in the 2019 R&R that the endangerment standard did not apply to the UGA because "there is no evidence that any drinking water is being contaminated by the Parks' septic discharge because the nitrogen in the Parks' effluent flows downgradient, where no water systems are located." *See* 2019 R&R at 30-33. The Court noted the parties' agreement that the Parks' septic tanks inject contaminants into the UGA, which is an underground source of drinking water, and are classified as Class V injection wells that discharge substances such as nitrogen, which constitute "contaminants" under the SDWA. *See* 2019 R&R at 31. The Court determined that the parties' dispute hinged upon the "legal distinction between discharged contaminants, which actually or potentially impact a public water *system*." *Id*. (emphasis in original). The Court concluded that, because contaminants are carried with groundwater, which generally flows in a downgradient direction, and

6

no drinking water wells exist downgradient of any of the Parks' septic systems, there is no evidence that any drinking water is or will be contaminated by the Parks' septic discharge, and, so, no unlawful impact on any water system. *See id.* at 32-33. As a result, summary judgment in Defendant's favor on the SDWA claim was appropriate, and the Court recommended that this claim be dismissed. *Id.*

In the 2021 R&R, the Court recommended denying Plaintiffs' motion for reconsideration as to the SDWA cause of action because not only did they fail to meet the standard for reconsideration on its claim, but also their argument that the Court overlooked the possibility of any adverse effects on health aside from compliance with national primary drinking water regulations was unavailing. 2021 R&R at 19-20. Because the UGA is not a drinking water system, the Court concluded it need not address whether any contaminants adversely affected the health of persons under the SDWA endangerment standard. *Id.* at 20; *see also* 42 U.S.C. § 300h(d)(2).

### C. Procedural History

Plaintiffs commenced this action on November 8, 2013 against former Commissioner Harvey and the New York State Parks Department. *See generally* Compl. The Complaint sought declaratory and injunctive relief, as well as civil penalties in connection with the sewage discharge at the Parks and alleged four causes of action: (i) Unauthorized Discharge of Pollutants in violation of the CWA; (ii) Operation of Large Capacity Cesspools in violation of the SDWA; (iii) Operation of Class V Wells Without a Permit and Endangering Underground Sources of Drinking Water in violation of the SDWA; and (iv) Imminent and Substantial

Endangerment of Health and the Environment in violation of the RCRA. *See generally* Compl. Plaintiffs filed their Amended Complaint on February 21, 2014, which contained the same four causes of action, named Harvey as the sole Defendant and removed all requests for civil penalties. *See generally* Am. Compl. After Harvey entered into a consent order with the New York State Department of Environmental Conservation to, *inter alia*, close 23 large capacity cesspools in the Parks within three years and subsequently did so, the parties stipulated to dismiss Plaintiffs' second cause of action for Operation of Large Capacity Cesspools in violation of the SDWA as moot. *See* DE [55], [64]. Defendant moved to dismiss the CWA and RCRA claims on June 11, 2014, *see* DE [15], which District Judge Leonard D. Wexler denied with leave to renew after discovery. *See* DE [22].[3]

Following discovery, the parties filed cross-motions for summary judgment and respective responses in opposition, *see* DEs [71], [73], [74], [75], which Judge Azrack referred to this Court for report and recommendation. *See* Nov. 2, 2018 Electronic Order. Plaintiffs' motion sought summary judgment as to liability with respect to the three remaining causes of action, and Defendant's motion sought dismissal of this litigation in its entirety. In the 2019 R&R, this Court concluded that triable issues of fact precluded summary judgment as to Plaintiffs' CWA and RCRA claims, but that Defendant was entitled to summary judgment on the SDWA claim, and recommended accordingly. *See generally* 2019 R&R.

---

[3] District Judge Joan M. Azrack was subsequently assigned to this case on January 15, 2015. *See* Jan. 15, 2015 Electronic Order.

On February 26, 2019, Judge Azrack stayed this action pending the Supreme Court's decision in *County of Maui v. Hawaii Wildlife Fund*, __ U.S. __, 140 S.Ct. 1462 (2020), which decided the applicable standard for evaluating Plaintiffs' CWA claim. *See* Feb. 26, 2019 Electronic Order. After the *Maui* decision was entered, Judge Azrack directed parties to brief motions for reconsideration so that this Court could consider the parties' arguments regarding *Maui* in the first instance. *See* May 18, 2020 Electronic Order. The parties filed cross-motions for reconsideration regarding the Court's 2019 R&R on December 8, 2020. DEs [91], [92].

On May 21, 2021, this Court issued the 2021 R&R recommending that the parties' motions be granted to the extent that the new standard should be applied to the CWA claim, and then adhered to all of the recommendations in the 2019 R&R including that summary judgment be denied as to the CWA claim and granting summary judgment for Defendants dismissing Plaintiffs' SDWA claim. *See generally* DE [93].

On July 6, 2021, the EPA, with the parties' consent, notified Judge Azrack that it was "considering whether to seek leave of this Court to file a Statement of Interest, as to certain legal issues addressed in the R&R," *see* DE [95] at 1, and ultimately sought leave of the Court on July 19, 2021. *See* DE [96]. On July 21, 2021, Plaintiffs and Defendant filed objections addressing both the 2019 R&R and the 2021 R&R, DEs [97], [98], and later filed responses to those objections. DEs [101], [102]. On September 1, 2021, the EPA filed its Statement of Interest objecting to the 2019 and 2021 R&R's interpretation of the SDWA as contrary to the statute and the EPA's

regulations implementing the UIC program.  *See generally* EPA's Mot.  The parties then filed responses to the EPA's Statement of Interest on September 29, 2021, and the EPA filed a reply on October 20, 2021.  *See* Plaintiffs' Response to EPA's Statement of Interest ("Pls.' Resp."), DE [104]; Defendant's Opposition to EPA's Statement of Interest ("Def's. Opp."), DE [105]; EPA's Reply in Support of Statement of Interest ("EPA's Reply"), DE [106].

On September 30, 2021, Judge Azrack partially adopted the Court's 2021 R&R granting the parties' motions for reconsideration to the extent that the new standard for the CWA claim should be applied and found that triable issues of fact preclude summary judgment as to Plaintiffs' CWA and RCRA claims.  DE [107] at 2-3.  Judge Azrack construed the EPA's Statement of Interest as a motion for reconsideration on Plaintiffs' SDWA claim and referred that motion to this Court for a report and recommendation.  *Id.* at 3.  For the reasons set forth below, the Court recommends denying the EPA's Motion.

## II.    LEGAL STANDARD

The decision to grant or deny a motion for reconsideration is "committed to the sound discretion of the district court."  *Wilder v. News Corp.*, No. 11-cv-4947, 2016 WL 5231819, at *3 (S.D.N.Y. Sept. 21, 2016) (internal quotation marks and citation omitted).  Courts in the Second Circuit will grant motions for reconsideration only where: (1) there has been a change in the law; (2) new evidence is available; or (3) there is a "need to correct a clear error or prevent manifest injustice."  *Frey v. Bekins Van Lines, Inc.*, No. 09-cv-5430, 2012 WL 2701642, at *1 (E.D.N.Y. July 5, 2012)

(citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).  Reconsideration is generally denied "unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Mir v. Shah*, 569 F. App'x 48, 50 (2d Cir. 2014) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).  A motion for reconsideration is "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court." *Belfiore v. Procter & Gamble Co.*, 140 F. Supp. 3d 241, 244 (E.D.N.Y. 2015) (internal quotation and citations omitted).

Upon moving for reconsideration, a party may, however, introduce new relevant authority that was not before the district court when it initially ruled on the matter. *See Vaughn v. Consumer Home Mortg. Co.*, 2007 WL 140956, at *6 (E.D.N.Y. Jan. 22, 2007).  Moreover, reconsideration may be appropriate if a court "misinterpreted or misapplied" relevant case law in its original decision. *Vill. Green At Sayville, LLC v. Town of Islip*, No. 217CV7391DRHARL, 2021 WL 230298, at *6 (E.D.N.Y. Jan. 22, 2021); *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) ("district courts may alter or amend judgment to correct a clear error of law or prevent manifest injustice.").  Nevertheless, Courts will not grant motions for reconsideration where litigants are simply attempting to "reargue their previous positions or present new or alternative theories that they [previously] failed to set forth[.]" *Callari v. Blackman Plumbing Supply, Inc.*, 988 F. Supp. 2d 261, 287 (E.D.N.Y. 2013); *see also Wall v. Constr. & Gen. Laborers' Union*, No. 06-cv-1264, 2009

WL 230122, at *1 (2d Cir. Feb. 2, 2009) (Summary Order) (affirming denial of motion for reconsideration because "motion simply reiterated earlier arguments and did not point to any new law or fact that created an exceptional circumstance mandating reconsideration").

## III.  DISCUSSION

The EPA argues that the Court's interpretation of the SDWA endangerment standard in its 2019 and 2021 R&Rs is "contrary to the statue and the EPA's regulations implementing the Underground Injection Control ("UIC") Program," and asks the Court to "correct the legal error in the R&R."  EPA's Mot. at 1.  More specifically, it contends that the SDWA non-endangerment standard at 42 U.S.C. § 300h(d)(2) and the EPA's implementing regulations apply to the UGA, an underground drinking water source, regardless of its potential effect on a drinking water system, but the EPA takes no position on the recommended application of that standard to the facts of this case.  EPA's Mot. at 1 n.1, 9-10.  In addition, the EPA argues that "[e]ven if the SDWA left some ambiguity regarding whether it protects underground drinking water without consideration of their current or future use by a drinking water system, the EPA's implementing regulations do not," and these regulations warrant *Chevron* deference.  *Id*. at 11.  For the reasons set forth below, these arguments fail, and the Court recommends denying the EPA's Motion.

Congress enacted the SDWA in 1974 in response to accumulating evidence that the Nation's drinking water "contains unsafe levels of a large variety of contaminants." *Environmental Def. Fund, Inc. v. Costle*, 578 F.2d 337, 339 (D.C. Cir.

1978).  Under the Act, the EPA is charged with promulgating "regulations restricting the concentration of such substances in drinking water."  *Id*.  As set forth above, one area of regulation concerns the UIC program.  *See* 42 U.S.C. § 300h; *see also* 40 C.F.R. § 144 (defining the regulatory framework of EPA administered permit programs); *id*. § 146 (setting forth technical criteria and standards for the UIC program).  Under the UIC program, "large septic tanks" that have the capacity to serve more than 20 people per day are considered "Class V" injection wells and are subject to various regulations.  *See id*. §§ 144.1(g)(1)(iv), (2)(iii), 144.81(9).  Specifically, the UIC program is designed to prevent underground injections that endanger water sources by introducing contaminants that might cause water systems to be noncompliant with primary drinking water regulations.  *See* 42 U.S.C. §§ 300h(b)(1), (d)(2).  The SDWA endangerment standard provides that:

> Underground injection endangers drinking water sources if such injection may result in the presence in underground water which supplies or can reasonably be expected to supply any public water system of any contaminant, and if the presence of such contaminant may result in such system's not complying with any national primary drinking water regulation or may otherwise adversely affect the health of persons.

42 U.S.C. § 300h(d)(2).  As a result, the EPA prohibits "injection activity in a manner that allows the movement of fluid containing any contaminant into underground sources of drinking water, if the presence of that contaminant may cause a violation of any primary drinking water regulation." 40 C.F.R. § 411.12(a).  An underground source of drinking water includes a nonexempt aquifer or portion thereof that "supplies any public water system" or "contains a sufficient quantity of ground water

to supply a public water system; and (i) [c]urrently supplies drinking water for human consumption; or (ii) [c]ontains fewer than 10,000 mg/L total dissolved solids." *Id*. § 144.3. A public water system refers to "a system for the provision to the public of water for human consumption through pipes or . . . other constructed conveyances," which "includes: any collection, treatment, storage, and distribution facilities." *Id*. § 141.2.

Initially, the EPA argues that the 2019 R&R's interpretation of the SDWA's endangerment standard at 42 U.S.C. § 300h(d)(2) is inconsistent with the plain meaning of the statute and contrary to the EPA's UIC regulations implementing the SDWA, and should be reconsidered as a "legal error." EPA's Mot. at 9; EPA's Reply at 3. The argument the EPA advances, however, that all underground sources of drinking water, like the UGA, are subject to the SDWA endangerment standard unless they have an aquifer exemption permit and regardless of their potential effect on a public water system, *see* EPA's Mot. at 9-10, is the same interpretation of the statute that Plaintiffs articulated in their summary judgment briefing and motion for reconsideration of the 2019 R&R. *See* DE [74] at 17-20; DE [91-1] at 18-25. As a result, the EPA's position does not meet the standard for reconsideration on Plaintiffs' SDWA claim. According to the EPA, the Court's interpretation of the SDWA endangerment standard is a "legal error," but it has not presented controlling case law or new evidence that the Court has overlooked in its decision in the 2019 R&R. Likewise, the EPA's arguments do not demonstrate that the Court, in its discretion, should correct a "clear error of law or prevent manifest injustice," *see Munafo v.*

*Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004), as the EPA concedes that the SDWA may leave "some ambiguity" as to whether the endangerment requires a showing of a possible effect on a public water system.   *See* EPA Mot. at 11. Accordingly, because the EPA reiterates the same arguments that Plaintiffs already made and has not presented new law or evidence for review, the Court recommends denying reconsideration on Plaintiffs' SDWA claim.

Next, the EPA argues that "even if the SDWA left some ambiguity regarding whether it protects underground drinking water without consideration of their current or future use by a drinking water system, EPA's implementing regulations do not," and these regulations warrant *Chevron* deference.  EPA's Mot. at 11.  Again, this argument does not meet the standard for reconsideration because it relies on the same evidence, the EPA's implementing regulations of the UIC program, that Plaintiffs presented in their opposition to Defendant's motion for summary judgment and their motion for reconsideration, which the Court has already considered twice. *See* DE [74] at 19-20; DE [91-1] at 20-22.[4]  The EPA reargues Plaintiffs' previous positions, which is insufficient for reconsideration.   *See Callari v. Blackman Plumbing Supply, Inc.*, 988 F. Supp. 2d 261, 287 (E.D.N.Y. 2013) ("a motion for reconsideration is not an opportunity for litigants to reargue their previous positions

---

[4] The Court also notes that the EPA presented arguments regarding legislative history of the UIC regulations, and that the legislative history instructs that the definition of "endanger" under the SDWA is extremely broad and should be liberally construed.  EPA's Mot. at 12-14.  Plaintiffs presented materially identical arguments in their opposition to Defendant's motion for summary judgment and motion for reconsideration on the Court's 2019 R&R.  *See* DE [74] at 20; DE [91-1] at 20-22.

or present new or alternative theories that they failed to set forth in connection with the underlying motion").

In reaching this conclusion, the Court addresses the EPA's assertion that it does not take a position with respect to the application of the SDWA endangerment standard to the facts of this case. EPA's Mot. at 1 n.1. This application, however, demonstrates why summary judgment is warranted on Plaintiffs' SDWA claim specifically regarding the UGA's geography and the Parks' septic discharge. The endangerment standard unambiguously states, "Underground injection endangers drinking water sources if such injection may result in the presence in underground water which supplies or can reasonably be expected to supply any *public water system* of any contaminant . . . ." 42 U.S.C. § 300h(d)(2) (emphasis added). Here, there is no evidence that any drinking water is being contaminated by the Parks' septic discharge because the nitrogen in the Parks' effluent flows downgradient, where no water systems are located or are expected to be located in the future because the Parks' proximity to the coastline would likely cause saltwater intrusion and render any water drawn from wells in that area non-potable. *See* 2019 R&R at 33 n.13; 2021 R&R at 19-20. Accordingly, the Court recommends denying the EPA's Motion which has not met the standard for reconsideration on Plaintiffs' SDWA claim.

## IV.   CONCLUSION

For the reasons set forth above, the Court respectfully recommends denying the EPA's Motion in its entirety.

## V.   OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.    Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of this report.    Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
     February 1, 2022

                           /s/ Steven I. Locke
                           STEVEN I. LOCKE
                           United States Magistrate Judge